# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 14, 2005         Decided March 18, 2005

No. 04-5145

SELECT MILK PRODUCERS, INC., ET AL.,
APPELLEES

v.

MIKE JOHANNS, SECRETARY,
U.S. DEPARTMENT OF AGRICULTURE,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00060)

---

*Michael E. Robinson*, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Michael Jay Singer*, Attorney. *Susan K. Ullman*, Attorney, entered an appearance.

*Ryan K. Miltner* argued the cause for appellees. With him on the brief were *Benjamin F. Yale*, *Kristine H. Reed*, and *Donald M. Barnes*.

Before: EDWARDS, HENDERSON, and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

EDWARDS, *Circuit Judge*: The Secretary of Agriculture ("Secretary") appeals the District Court's award of attorney's fees and costs to several milk marketing cooperatives under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2000). The underlying litigation involved a dispute between the cooperatives and the Secretary over the price of Class III butterfat. The Secretary argues that the District Court erred in concluding that the milk cooperatives were "prevailing parties" under EAJA and in calculating the amount of the award.

The price of raw milk and its component parts is governed by a complex regulatory regime known as the Federal Milk Marketing Orders ("FMMO"). The Secretary administers the FMMO pursuant to authority under the Agricultural Marketing Agreement Act ("AMAA"), 7 U.S.C. § 601 *et seq.* (2000). Prior to 2000, the price under the FMMO for Class III butterfat (which is used to make hard cheeses) was the same as the price for Class IV butterfat (which is used to make butter and nonfat dry milk). In December of that year, the Secretary promulgated a rule creating a separate price for Class III butterfat. The new price, which was to be announced on February 2, 2001, would have applied retroactively to transactions that had taken place in January 2001. *See Select Milk Producers, Inc. v. Veneman*, 304 F. Supp. 2d 45, 48-49 (D.D.C. 2004).

Select Milk Producers, Inc., Continental Dairy Products, Inc., and Elite Milk Producers, Inc. (collectively "Milk Producers") are milk marketing cooperatives, which would have been subject to an immediate loss of an estimated $5,000,000 if the new price for Class III butterfat had taken effect. *Id.* at 53. On January 31, 2001, the District Court granted Milk Producers' motion for a preliminary injunction enjoining the Secretary from imposing a separate price for Class III butterfat. The

Government did not appeal the preliminary injunction or otherwise seek to defend its position. Instead, the Secretary issued a new rule that did not include a separate price for Class III butterfat. The parties then stipulated to dismissal of the case as moot. *See id.* at 49-50.

On May 30, 2003, Milk Producers moved for an award of attorney's fees and costs under EAJA, which allows "prevailing parties" to obtain expenses in litigation against the federal government unless the Government's position is substantially justified. *See* 28 U.S.C. § 2412(d)(1)(A). The District Court concluded that Milk Producers were "prevailing parties" under EAJA and that the Secretary's position in seeking to implement the separate price for Class III butterfat was not substantially justified. Therefore, the court held that Milk Producers were entitled to attorney's fees and costs. *See Select Milk*, 304 F. Supp. 2d at 50-54. The District Court also determined that two of Milk Producers' attorneys should be compensated for some of their hours at rates above EAJA's statutory cap, because the attorneys' expertise in the milk marketing regime was a "special factor" that warranted an enhanced fee under the statute. *See id.* at 55-57.

On appeal, the Secretary argues that Milk Producers were not "prevailing parties" under EAJA, and that, even if appellees were "prevailing parties," the District Court's fee enhancement award was an abuse of discretion. We affirm in part and reverse in part. First, we find that the preliminary injunction at issue in this case was a judgment that resulted in a court-ordered change in the legal relationship between the parties and gave Milk Producers the concrete and irreversible redress that they sought. Given these circumstances, Milk Producers are "prevailing parties" under EAJA. Second, we reverse the District Court's fee enhancement award. The established law of the circuit makes it clear that legal expertise acquired through practice is

not a "special factor" justifying an enhanced fee award under EAJA.

## I. BACKGROUND

The factual background of this case is recited at length in the District Court's opinion. *See Select Milk Producers, Inc. v. Veneman*, 304 F. Supp. 2d 45 (D.D.C. 2004) ("*Select Milk*"). Therefore, there is no need here for a detailed statement of facts. Rather, we will focus on the facts that are relevant to the disposition of this appeal.

The FMMO is a complex regulatory regime governing the price of raw milk and its components. *Id*. at 48. In order to amend market prices under the FMMO, the Secretary must provide notice and an opportunity for a hearing. *See* 7 U.S.C. § 608c(3) (2000). Under agency regulations, before conducting a hearing, the Secretary must first issue a Notice of Hearing, which, among other things, delineates the scope of the hearing. *See* 7 C.F.R. § 900.4(a) (2004). An Administrative Law Judge ("ALJ") then presides over the hearing, and, following the hearing, the Secretary issues a decision on the proposed amendment. *See id.* §§ 900.6, 900.13a. To become effective, the amendment must be ratified by a designated number of milk producers. *See* 7 U.S.C. § 608c(8), (9); 7 C.F.R. § 900.14.

In the Consolidated Appropriations Act of 2000, Pub. L. No. 106-113, 113 Stat. 1501 (1999), Congress directed the Secretary to conduct emergency rulemaking to amend the FMMO. The statute instructed the Secretary to issue amended regulations by December 1, 2000, and implement the resulting formulas for milk pricing by January 1, 2001. *See id.* Div. B., § 1008(a)(8), 113 Stat. 1536, 1501A-518. In response to this legislation, the Secretary published a Notice of Hearing in the Federal Register in April 2000, listing various proposals to amend the FMMO. *See* Milk in the Northeast and Other Marketing Areas; Notice of Hearing on Class III and Class IV

Milk Pricing Formulas, 65 Fed. Reg. 20,094 (Apr. 14, 2000) ("April Notice"). Prior to the April Notice, the price for Class III butterfat had been the same as the price for Class IV butterfat, and the notice did not propose the creation of a separate price for Class III butterfat. In May 2000, an ALJ presided over a five-day hearing on the proposed amendments. During the hearing, one of the participants sought to raise the possibility of imposing a separate price for Class III butterfat. However, with the agreement of the Secretary's representative, the ALJ concluded that the issue was beyond the scope of the hearing. *See Select Milk*, 304 F. Supp. 2d at 48.

Thus, it is uncontested that the Secretary never gave notice of the possibility of a separate price for Class III butterfat, and this matter was never pursued as an issue in the hearing before the ALJ. Nonetheless, in December 2000, the Secretary issued a tentative final decision that, *inter alia*, created a separate price for Class III butterfat. *See* Milk in the Northeast and Other Marketing Areas; Tentative Decision on Proposed Amendments and Opportunity To File Written Exceptions to Tentative Marketing Agreements and to Orders, 65 Fed. Reg. 76,832 (Dec. 7, 2000) ("Tentative Decision"). The new Class III butterfat price was scheduled to be announced on February 2, 2001, retroactive to January 1 of that year. *See Select Milk*, 304 F. Supp. 2d at 49. After the Tentative Decision was approved by more than the required number of dairy producers, the Secretary promulgated an interim rule amending the FMMO in order to implement the new prices. *See* Milk in the Northeast and Other Marketing Areas; Interim Amendment of Orders, 65 Fed. Reg. 82,832 (Dec. 28, 2000) ("December 2000 rule").

Milk Producers sought a preliminary injunction in District Court to prevent the implementation of the December 2000 rule, arguing that the Secretary had failed to comply with the notice and hearing procedures for amending the FMMO as mandated by the AMAA and agency regulations. On January 31, 2001,

the District Court granted Milk Producers the relief they requested, entering a preliminary injunction that enjoined the Secretary from imposing the separate Class III butterfat price. *Select Milk Producers, Inc. v. Glickman*, No. 01-00060 (D.D.C. Jan. 31, 2001) ("2001 preliminary injunction"), *reprinted in* Joint Appendix ("J.A.") 30.

The consequences of the 2001 preliminary injunction were significant. The District Court found that, absent the injunction, "[t]he retroactive nature of the [Secretary's] price announcement meant that on February 2, 2001, [Milk Producers] would [have been] subject to an immediate loss of an estimated $5,000,000." *Select Milk*, 304 F. Supp. 2d at 53. This loss would have resulted from transactions between Milk Producers and third parties that were consummated in January 2001. *See id.* The District Court also found that, had the new Class III butterfat price taken effect, Milk Producers' loss could not have been recovered. Thus, the trial court held that "a preliminary injunction was the only effective relief [that Milk Producers] could seek." *Id.* And in avoiding the substantial monetary loss that they had faced, Milk Producers received irreversible relief by virtue of the preliminary injunction.

The District Court's order embodying the preliminary injunction was subject to immediate appellate review. The Secretary chose not to appeal, however. Instead of pursuing any further litigation in the matter, the Secretary acceded to the preliminary injunction and conducted a new rulemaking. The Secretary then issued a new regulation that took effect on April 1, 2003, and did not include a separate price for Class III butterfat. *See* Milk in the Northeast and Other Marketing Areas: Order Amending the Orders, 68 Fed. Reg. 7063 (Feb. 12, 2003). Following issuance of the new rule, the parties stipulated to dismissal of the case as moot. *Select Milk Producers, Inc. v. Veneman*, No. 01-00060 (D.D.C. Apr. 30, 2003), *reprinted in* J.A. 86.

On May 20, 2003, Milk Producers moved for an award of attorney's fees and costs under EAJA, 28 U.S.C. § 2412 (2000). The District Court concluded that the two key requirements for awarding expenses under EAJA were satisfied: (1) Milk Producers were "prevailing parties" under the statute, and (2) the Secretary's position in promulgating the separate Class III butterfat price was not substantially justified. *See Select Milk*, 304 F. Supp. 2d at 50-54.

In calculating the amount of the award, the District Court compensated most of Milk Producers' attorneys' time at the normal statutory maximum rate of $125/hour adjusted upward for cost of living. However, relying on 28 U.S.C. § 2412(d)(2)(A), which allows fee awards at rates beyond the normal statutory cap where a "special factor" exists, the District Court compensated attorney Benjamin Yale at $325/hour and attorney Donald Barnes at $385/hour for one-third of the hours they spent working toward obtaining the preliminary injunction. The District Court concluded that these hours met the "special factor" exception, because Yale and Barnes had special expertise in the federal milk marketing regime and that, with regard to one-third of the hours the attorneys spent working toward the preliminary injunction, their specialized skills were necessary to advance the litigation. *See Select Milk*, 304 F. Supp. 2d at 55-57. In reaching this conclusion, the District Court rested solely on findings that Yale and Barnes had acquired expertise in the complex milk marketing regime through years of practice. *See id.* at 57. In total, the District Court awarded Milk Producers $101,266.83 – comprising $98,381.22 in attorney's fees and $2,885.61 in costs. *Id.* at 60.

On appeal, the Secretary does not contest the District Court's conclusion that the separate price for Class III butterfat was not substantially justified. Instead, the Secretary argues that the District Court misconstrued EAJA when it concluded that Milk Producers were "prevailing parties." The Secretary also

contends that, even if Milk Producers were prevailing parties, the District Court erred in awarding enhanced fees to attorneys Yale and Barnes.

## II. ANALYSIS

### A. *The "Prevailing Party" Requirement of EAJA*

EAJA provides, in relevant part, that

> a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The Secretary claims that the District Court committed legal error in holding that Milk Producers satisfied EAJA's "prevailing party" requirement. We review this claim *de novo*. *See Truckers United for Safety v. Mead*, 329 F.3d 891, 894 (D.C. Cir. 2003); *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486, 491 (D.C. Cir. 2003) ("*Thomas*").

### 1. *Defining "Prevailing Parties" Under EAJA*

The Government's argument in this case appears to be premised on an assumption that, under the Supreme Court's decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598 (2001) ("*Buckhannon*"), and this court's subsequent decision in *Thomas*, a preliminary injunction can *never* transform a party in whose favor the injunction is issued into a "prevailing party" under EAJA. *See* Appellant's Br. at 10. Indeed, in arguing that "[Milk Producers] received *only* a preliminary injunction, but no 'enforceable judgment on the merits' or 'court-ordered consent decree,'" *id*. at 14 (emphasis

added), the Government comes close to suggesting that we should adopt a *per se* rule that a preliminary injunction can never support a claim for fees under EAJA. We reject this view, because it rests on faulty constructions of EAJA, *Buckhannon*, and *Thomas*.

EAJA is one of a number of federal statutes that allows courts to award attorney's fees and costs to the "prevailing party." In *Buckhannon*, the Supreme Court considered whether the term "prevailing party" in federal fee-shifting statutes "includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon*, 532 U.S. at 600. Prior to *Buckhannon*, most courts of appeals had recognized the "catalyst theory," pursuant to which such a voluntary change in the defendant's conduct was sufficient to render the plaintiff a "prevailing party." *Id.* at 601-02 & n.3 (citing cases). *Buckhannon* rejected this approach and explained that a "'prevailing party' is one who has been awarded some relief by the court." *Id.* at 603. The Court thus held that the "catalyst theory" improperly "allows an award when there is no judicially sanctioned change in the legal relationship of the parties." *Id.* at 605. Although the fee-shifting statutes at issue in *Buckhannon* were provisions of the Fair Housing Amendments Act, 42 U.S.C. § 3613(c)(2), and the Americans with Disabilities Act, 42 U.S.C. § 12205, *see id.* at 603, it is now clear that *Buckhannon*'s construction of "prevailing party" also applies to fee claims arising under EAJA. *See Thomas*, 330 F.3d at 492.

Although *Buckhannon* decisively rejected the "catalyst theory," the Court clearly did not adopt a rule that plaintiffs could only be deemed "prevailing parties" for fee-shifting purposes if they obtained a final judgment on the merits of a suit. Indeed, as counsel for the Secretary correctly

acknowledged at oral argument, *see* Recording of Oral Argument at 27:51-29:22, the decision in *Buckhannon* left no doubt that a plaintiff need not obtain a judicial determination on the merits in order to be considered a "prevailing party." On this point, the Court explained:

> In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered "chang[e] [in] the legal relationship between [the plaintiff] and the defendant."

*Buckhannon*, 532 U.S. at 604 (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)) (alterations in original) (additional citations omitted). In short, the holding in *Buckhannon* embraces the possibility that, under certain circumstances, a preliminary injunction, like a consent decree, may result in a court-ordered change in the legal relationship between the parties that is sufficient to make the plaintiff a "prevailing party" under a fee-shifting statute like EAJA. Therefore, *Buckhannon* surely does not endorse a *per se* rule that a preliminary injunction can *never* transform a party in whose favor the injunction is issued into a "prevailing party" under EAJA.

Likewise, the Government is wrong in suggesting that our decision in *Thomas* holds that there are no circumstances under which a preliminary injunction can serve as the basis for deeming plaintiffs "prevailing parties" under federal fee-shifting statutes. In *Thomas*, plaintiffs sued an independent federal agency, the National Science Foundation ("NSF"), over Internet domain registration fees. The District Court entered a preliminary injunction prohibiting NSF from "'crediting, spending, obligating, or using any of the money collected for, placed into, or taken from'" a fund that included the registration

fees at issue, pending the final adjudication of the case. *Thomas*, 330 F.3d at 489 (quoting District Court's preliminary injunction). The District Court also awarded plaintiffs partial summary judgment, determining that the collection of fees was unconstitutional. However, before the District Court entered final judgment or addressed plaintiffs' claim for relief, Congress passed a law that cured the constitutional violation in the collection of the registration fees, and the District Court granted NSF's motion to dismiss the case as moot. *See id.* at 489-90.

The *Thomas* plaintiffs then filed a request for expenses under EAJA, and the District Court held that the plaintiffs were "prevailing parties" entitled to fees. *Id.* at 488. This court reversed, concluding that neither the preliminary injunction nor the partial summary judgment at issue changed the legal relationship between the parties so as to render the plaintiffs "prevailing parties." *Id.* at 493. We noted that

> the sole effect of the preliminary injunction was to prevent NSF from appropriating any money already collected from the registration assessment . . . . In short, the preliminary injunction did not change the legal relationship between the parties in a way that afforded [plaintiffs] the relief they sought in their lawsuit.

*Id.*

Quite clearly, *Thomas* established no *per se* rule that a preliminary injunction can never serve as the basis for deeming a plaintiff a "prevailing party" under EAJA. Rather, *Thomas* held that, in the particular circumstances of that case, plaintiffs could not satisfy the "prevailing party" requirement, because the preliminary injunction at issue had not changed the legal relationship between the parties. *Thomas* did not suggest that, in a dispute such as the one now before us, where a preliminary injunction effected a substantial change in the legal relationship between the parties and provided plaintiffs with concrete and

irreversible relief, plaintiffs could not be considered "prevailing parties."

We are not alone in the view that *Buckhannon* does not reject the possibility that preliminary injunctions may be sufficient in some certain circumstances to render plaintiffs "prevailing parties" under federal fee-shifting statutes. Both the Sixth Circuit and the Ninth Circuit adopted this position in decisions issued after *Buckhannon*. *See Dubuc v. Green Oak Township*, 312 F.3d 736, 753-54 & n.8 (6th Cir. 2002) (noting *Buckhannon*'s rejection of the "catalyst theory," but explaining that preliminary injunctions can suffice to satisfy the "prevailing party" requirement under certain circumstances); *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003) ("A preliminary injunction issued by a judge carries all the 'judicial imprimatur' necessary to satisfy *Buckhannon*."). *But see Smyth v. Rivero,* 282 F.3d 268, 276-77 & n.9 (4th Cir. 2002) (apparently adopting a *per se* rule). We think it is clear that neither *Buckhannon* nor *Thomas* endorse a *per se* rule that a preliminary injunction can *never* transform a party in whose favor the injunction is issued into a "prevailing party" under EAJA. Such a position simply does not follow logically from the Court's indication in *Buckhannon* that a plaintiff need not obtain a final judicial determination on the merits in order to be considered a "prevailing party." *See Buckhannon*, 532 U.S. at 604.

2. *Applying* Buckhannon *and* Thomas *to the Facts of this Case*

Our decision in *Thomas* relies on *Buckhannon* to develop a framework for determining whether plaintiffs are "prevailing parties." Applying the *Thomas* framework to the facts of this case, we conclude that Milk Producers were "prevailing parties" under EAJA.

In *Thomas*, we explained that *Buckhannon* embraces three core principles for construing the term "prevailing party" in federal fee-shifting statutes:

First, in order to be a prevailing party, a claimant must show that there has been a court-ordered change in the legal relationship between the plaintiff and the defendant. (Citing *Buckhannon*, 532 U.S. at 604.)

Second, a prevailing party is a party in whose favor a judgment is rendered, regardless of the amount of damages awarded. (Citing *Buckhannon*, 532 U.S. at 603.)

Third, a claimant is not a prevailing party merely by virtue of having acquired a judicial pronouncement unaccompanied by judicial relief. (Citing *Buckhannon*, 532 U.S. at 606.)

*See Thomas*, 330 F.3d at 492-93 (discussing these factors).

In this case, plaintiffs satisfy all three *Thomas* factors. First, there was a court-ordered change in the legal relationship between Milk Producers and the Secretary. The trial court's preliminary injunction blocked enforcement of the new regulation that had been promulgated by the Secretary in December 2000. As a result, Milk Producers were never required to operate under a market regime with a separate price for Class III butterfat. In addition, the court-ordered relief secured by Milk Producers was concrete and irreversible as of February 2, 2001. The District Court stated that, because the 2001 preliminary injunction vitiated the December 2000 rule, Milk Producers saved an estimated $5,000,000 that they would have otherwise been forced to pay when the new price for Class III butterfat took effect on February 2, 2001, retroactive to January 1, 2001. *See Select Milk*, 304 F. Supp. 2d at 53 (citing Milk Producers' motion for preliminary injunction).

Neither the Secretary's briefs nor oral argument to this court purported to contradict the District Court's conclusion that, as a direct result of the 2001 preliminary injunction, Milk Producers saved a substantial sum of money. *See* Recording of Oral Argument at 2:37-3:57. The Secretary's counsel also conceded that any money Milk Producers saved was permanent. *See id*. at 4:00-:09. Therefore, like the benefit plaintiffs receive through court-approved consent decrees, the relief that Milk Producers received in this case was "the product of, and bears the sanction of, judicial action *in the lawsuit*." *Buckhannon*, 532 U.S. at 618 (Scalia, J., concurring).

This case is similar to situations in which we have found that the subsequent mootness of a case does not necessarily alter the plaintiffs' status as prevailing parties. *See, e.g., Nat'l Black Police Ass'n v. D.C. Bd. of Elections*, 168 F.3d 525, 528 (D.C. Cir. 1999); *Grano v. Barry*, 783 F.2d 1104, 1108-09 (D.C. Cir. 1986). As we noted in *Thomas*,

> [t]he specific relief granted in [*Nat'l Black Police Ass'n* and *Grano*] was concrete and could not be reversed despite a subsequent finding of mootness. In *Grano*, for example, plaintiffs sought and won an injunction to delay the demolition of a historical site until a public referendum was held. 783 F.2d at 1108. That reprieve was unchanged when the case was later declared moot, because the referendum in question had already occurred. The injunction produced a lasting change in the parties' legal circumstances and gave the plaintiffs the precise relief that they had sought.

*Thomas*, 330 F.3d at 493. The plaintiffs in *Thomas* differed from those in *Nat'l Black Police Ass'n* and *Grano* and were found not to be "prevailing parties," because the *Thomas* plaintiffs "filed a lawsuit in order to obtain a refund from [the National Science Foundation], but the preliminary injunction did nothing to vindicate that claim." *Id.* Here, however, just as was the case for the plaintiffs in *Grano*, Milk Producers' claim was

fully vindicated by the court-ordered change in the parties' relationship. And as *Thomas* noted in its discussion of *Nat'l Black Police Ass'n* and *Grano*, it does not matter that this case became moot *after* the court-ordered change in the parties' relationship. *Thomas*, 330 F.3d at 493.

*Nat'l Black Police Ass'n* and *Grano* differ from this case in that the plaintiffs in those cases received final judgments on the merits of their claims, whereas the plaintiffs here secured relief through a preliminary injunction. Nonetheless, it is noteworthy here that, in awarding a preliminary injunction to Milk Producers, the District Court found that

> plaintiffs were likely to succeed on the merits of their claims [because] "the Secretary . . . clearly did not give fair notice to the industry."

*Select Milk*, 304 F. Supp. 2d at 49 (quoting hearing on the 2001 preliminary injunction). Just as the Government did not appeal from the District Court's holding that the Secretary's position in imposing the separate Class III butterfat price was not substantially justified, neither does the Government take issue with the District Court's finding that Milk Producers undoubtedly would have succeeded on the merits. In other words, this is not a case in which a preliminary injunction was based less on the trial court's view of the merits than on a perceived hardship to the plaintiff. *See Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998) (discussing the four factors that a court must balance on a sliding scale in considering a request for a preliminary injunction). Rather, Milk Producers secured a preliminary injunction in this case largely because their likelihood of success on the merits was never seriously in doubt.

The dissent disagrees with our holding that the 2001 preliminary injunction resulted in a court-ordered change in the legal relationship between Milk Producers and the Secretary,

because, according to the dissent, in this case the preliminary injunction did "nothing more than preserv[e] the *status quo*." But, as we explained above, the 2001 preliminary injunction provided concrete and irreversible judicial relief to Milk Producers based on the District Court's conclusion that Milk Producers were likely to prevail on the merits. In these circumstances, the dissent's argument that the 2001 preliminary injunction did not alter the status quo – based on its formalistic resort to the definition of the status quo as "the last peaceable uncontested status existing between the parties before the dispute developed" – is beside the point. Whatever semantic spin one wishes to put on it, the 2001 preliminary injunction resulted in an irreversible and substantial monetary savings to Milk Producers based on the District Court's assessment of the merits of Milk Producers' claim. Clearly, then, the 2001 preliminary injunction was a court-ordered change in the legal relationship between the parties.

Having concluded that the 2001 preliminary injunction was a court-ordered change in the legal relationship between Milk Producers and the Secretary, as required by the first *Thomas* factor, we turn to consider the second and third *Thomas* factors. We hold that they too were satisfied in this case.

The 2001 preliminary injunction was a judgment rendered in favor of Milk Producers, thus meeting the second *Thomas* factor. The term "judgment" includes "a decree and any order from which an appeal lies." BLACK'S LAW DICTIONARY 846 (7th ed. 1999) (citing FED. R. CIV. P. 54). And it is well established that preliminary injunctions are appealable orders under 28 U.S.C. § 1292(a)(1). *See, e.g.*, *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 482 (1999). Nothing in *Thomas* indicates that we meant to depart from the ordinary definition of "judgment" in determining whether plaintiffs have satisfied the second part of the "prevailing party" framework. *See Thomas*, 330 F.3d at 493. The 2001 preliminary injunction meets the

legal definition of a judgment, and there is no dispute that it was rendered in Milk Producers' favor.  Therefore, Milk Producers have satisfied the second *Thomas* factor.

Finally, the 2001 preliminary injunction surely provided Milk Producers with "judicial relief," as required by the third *Thomas* factor.  The same edition of Black's Law Dictionary that the Supreme Court cited in *Buckhannon*, 532 U.S. at 603, defines relief as "redress or benefit, esp. equitable in nature (*such as an injunction* or specific performance) that a party asks of a court."  BLACK'S LAW DICTIONARY, *supra* at 1293 (emphasis added).  In this case, Milk Producers asked the District Court for equitable relief in the form of a preliminary injunction that would enjoin the implementation of the December 2000 rule before the separate price for Class III butterfat took retroactive effect.  When the District Court issued the injunction, it granted Milk Producers the precise relief that they had requested.  This satisfied the third *Thomas* factor.

In holding that Milk Producers were "prevailing parties" under EAJA, we note that this is not a case in which the Government voluntarily changed its ways *before* judicial action was taken.  If the Government had acted to moot this case through voluntary cessation before there was a judicially sanctioned change in the legal relationship of the parties, Milk Producers would not have been "prevailing parties."  This would be so, because, as the Court noted in *Buckhannon*, a defendant's "voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change.  Our precedents thus counsel against holding that the term 'prevailing party' authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties."  532 U.S. at 605.  However, the record in this case demonstrates that the District Court's injunction, not the Secretary's voluntary change in conduct, afforded Milk Producers the relief they sought – a

savings of an estimated $5,000,000 and an order barring the Secretary from enforcing  the new rule imposing a separate price for Class III butterfat.

We also note that our decision comports with the well-recognized principle that, normally, when a losing party is blocked from appealing an adverse judgment or order because the case becomes moot due to happenstance, the court will vacate the disputed judgment or order.  *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994) ("*Bancorp*").  "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *Id*. at 25.  In applying this principle, however, the Supreme Court has made it clear that "[t]he principal condition to which [a court should look] is whether the party seeking relief from the judgment below caused the mootness by voluntary action." *Id.* at 24.  *See also N. Cal. Power Agency v. Nuclear Regulatory Comm'n*, 393 F.3d 223, 225 (D.C. Cir. 2004) (construing *Bancorp* to mean that "vacatur in moot cases should be determined by considerations of 'fairness' and 'justice'").  Thus, "vacatur is usually inappropriate when 'the party seeking relief from the judgment below caused the mootness by voluntary action.'" *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 351 (D.C. Cir. 1997) (quoting *Bancorp,* 513 U.S. at 24); *N. Cal. Power Agency*, 393 F.3d at 225.  Indeed, the Supreme Court has made it clear that even "[w]here mootness results from settlement, . . . the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur." *Bancorp,* 513 U.S. at 25.  Just as it is not unfair to deny the remedy of vacatur to a party whose voluntary action moots a case, it is not somehow unfair here to conclude that Milk Producers were "prevailing parties" when the Government voluntarily forfeited its right to appeal the

injunction and voluntarily elected to moot the case *after* judicial action was taken against the Government.

In sum, we hold that the District Court correctly concluded that Milk Producers were "prevailing parties" under EAJA. The Secretary has not contested the District Court's finding that the Secretary's position in creating a separate price for Class III butterfat was not substantially justified. Therefore, we affirm the District Court's decision that Milk Producers are entitled to attorney's fees and costs. We now turn to the question as to whether the District Court properly granted an enhancement in the hourly fees awarded to two of Milk Producers' attorneys.

## B. *The Fee Enhancement*

EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Here, the District Court concluded that a "special factor" justified an enhancement in the hourly rates awarded to attorneys Yale and Barnes for one-third of the time they spent working toward obtaining the preliminary injunction. We review the District Court's enhancement award for abuse of discretion. *See Pierce v. Underwood*, 487 U.S. 552, 571 (1988). We conclude that the District Court abused its discretion in awarding the enhanced fee, because Milk Producers failed to establish that either Yale or Barnes had "'some distinctive knowledge or specialized skill needful for the litigation in question.'" *Truckers United*, 329 F.3d at 894 (quoting *Underwood*, 487 U.S. at 572).

In *Underwood*, the Supreme Court explained that the reference to the "limited availability of qualified attorneys" in § 2412(d)(2)(A)(ii) "must refer to attorneys 'qualified for the proceedings' in some specialized sense, rather than just in their

general legal competence." *Underwood*, 487 U.S. at 572. To qualify for compensation at enhanced hourly rates under this standard, an attorney must possess "some distinctive knowledge or specialized skill needful for the litigation in question," which can include "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* The Court further explained that "the other 'special factors' envisioned by the exception [to EAJA's normal maximum hourly rate] must be such as are not of broad and general application." *Id.* at 573. The difficulty or undesirability of the case, the work and ability of counsel, and the results obtained do not qualify as "special factors" under the statute. *Id.*

Applying *Underwood*, we have made clear that an attorney cannot be awarded enhanced fees under the "special factor" exception based solely on expertise the lawyer acquired through practice in a specific area of administrative law. As we stated in *F.J. Vollmer Co. v. Magaw*, 102 F.3d 591, 598 (D.C. Cir. 1996), while "lawyers practicing administrative law typically develop expertise in a particular regulated industry, whether energy, communications, railroads, or firearms . . . they usually gain this expertise from experience, not from the specialized training justifying fee enhancement." Emphasizing that nothing in the text or legislative history of EAJA suggests that Congress intended to make "all lawyers practicing administrative law in technical fields" eligible for a fee enhancement, we concluded that "expertise acquired through practice" was not a "special factor" that could warrant an enhanced fee. *Id.* at 598-99.

In this case, the District Court found that attorneys Yale and Barnes had "specialized knowledge" of the "extremely complex" federal milk marketing regime. *Select Milk*, 304 F. Supp. 2d at 55-56. The District Court further found that this specialized knowledge was "needful for the litigation in question" with respect to one-third of the hours that Yale and Barnes spent working toward obtaining the preliminary

injunction. The court thus held that Yale and Barnes were entitled to compensation at enhanced rates for those hours. *Id.* at 57. The fundamental flaw in this analysis is that the justification the District Court offered for concluding that Yale and Barnes had "specialized knowledge" was the expertise the attorneys had acquired through practice. *See id.* at 57 ("Attorney Yale specializes in the representation of dairy farms and dairy cooperatives . . . . Attorney Barnes has spent over three decades representing dairy cooperatives on issues relating to the AMAA."). As explained above, under the clear precedent of this circuit, such expertise acquired through practice in a particular field of administrative law is insufficient to justify an enhanced fee award under the "special factor" exception to EAJA's normal cap on attorney's fees. *See F.J. Vollmer*, 102 F.3d at 598.

The District Court did also note that Yale "worked in the dairy industry prior to becoming an attorney." *Select Milk*, 304 F. Supp. 2d at 57. But the District Court merely mentioned this fact, failing to explain how any knowledge that Yale acquired from his previous work in the dairy industry was needful for the litigation in question – a precondition for a court to find that a "special factor" exists warranting fee enhancement under EAJA. *See Truckers United*, 329 F.3d at 896. Because the only relevant expertise identified by the District Court was expertise Yale and Barnes acquired through years of practice in a field of administrative law, there was no justification for an enhanced fee award under EAJA. The District Court's contrary conclusion was an abuse of discretion. *See id.* at 894.

## III. CONCLUSION

The District Court's judgment is affirmed in part and reversed in part. For the reasons stated above, we affirm the District Court's conclusion that Milk Producers were "prevailing parties" entitled to attorney's fees and costs under EAJA. However, we reverse the District Court's determination that

attorneys Yale and Barnes were entitled to enhanced fees for one-third of the hours they worked toward obtaining the 2001 preliminary injunction. The case will be remanded to the District Court so that it can adjust the attorney's fees award as required by this decision.

*So ordered.*

HENDERSON, *Circuit Judge*, *dissenting*: As does the majority, I believe that the district court erred by enhancing the attorney's fee award, made pursuant to the Equal Access to Justice Act (EAJA), *see* 28 U.S.C. § 2412(a) & (d), to Select Milk Producers, Inc., Continental Dairy Products, Inc. and Elite Milk Producers, Inc. (collectively, Milk Producers) based on their counsel's familiarity with the arcana of the federal milk regulations. *See Zuber v. Allen*, 396 U.S. 168, 172 (1969) (observing "[o]nce again this Court must traverse the labyrinth of the federal milk marketing regulation provisions"); *Queensboro Farms Prods., Inc. v. Wickard*, 137 F.2d 969, 974 (2d Cir. 1943) ("[T]he 'milk problem' is exquisitely complicated."). I would not reach this issue, however, because I believe the district court erred in awarding *any* attorney's fees to the Milk Producers. Whether a party can be a "prevailing party" under a fee-shifting statute by obtaining preliminary injunctive relief is one that has divided the circuits—some say yes, some say no. I do not think we need to give a categorical answer to the question—even assuming preliminary injunctive relief can support "prevailing party" status, the Milk Producers do not qualify. Accordingly, because I would reverse the district court's award, I respectfully dissent.

## I.

In various fee-shifting statutes such as the EAJA, the Congress has supplanted the American Rule—requiring a litigant to pay his own way, win or lose—by authorizing the award of fees and costs to the "prevailing party." *See generally Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260-61 n.33 (1975) (listing over 25 statutes authorizing attorney's fees in favor of prevailing party). The circuits that have considered whether this term includes a party that obtains preliminary injunctive relief have, with one exception, used as their polestar the United States Supreme Court's decision in *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001) [hereinafter *Buckhannon*]. Interpreting two similar fee-shifting statutes—section 3613 of the Fair Housing

Amendments Act of 1988, 42 U.S.C. § 3613(c)(2), and section 12205 of the Americans With Disabilities Act, 42 U.S.C. § 12205—the Supreme Court rejected the "catalyst theory" under which several circuit courts had concluded that "a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct."[1] *Buckhannon*, 532 U.S. at 601-02. The Court first observed that the Congress, in describing the type of litigant eligible for an award, used a term—"prevailing party"—with a well-known legal meaning, *i.e.*, "one who has been awarded some relief by the court." *Id.* at 603. Noting that " '[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail,' " *id.* (quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)) (alteration in *Buckhannon*), it reaffirmed that its earlier holdings had satisfied the test because the plaintiffs in those cases had "received a judgment on the merits" or secured a settlement agreement enforced by a consent decree. *Id.* at 605. It also emphasized, however, that it had declined to award fees "where the plaintiff ha[d] . . . acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by '*judicial* relief,' " *id.* at 605-06 (quoting *Hewitt*, 482 U.S. at 760) (emphasis in *Buckhannon*), and had "[n]ever . . . awarded attorney's fees for a nonjudicial alteration of actual

---

[1] In *Oil, Chem. & Atomic Workers Int'l Union v. Dep't of Energy*, 288 F.3d 452 (D.C. Cir. 2002), we held that "eligibility for an award of attorney's fees [under one fee-shifting statute] should be treated the same as eligibility determinations made under other fee-shifting statutes unless there is some good reason for doing otherwise." *Id.* at 455; *see Buckhannon*, 532 U.S. at 603 n.4 (noting "[w]e have interpreted . . . fee-shifting provisions consistently" (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983))). In *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486 (D.C. Cir. 2003), we held that "*Buckhannon* applies to the definition of 'prevailing parties' under the EAJA." *Id.* at 492 n.1 (citations omitted).

circumstances." *Id.* at 606 (internal quotation marks & citation omitted). Regarding a "settlement agreement[] enforced through a consent decree," *id.* at 604, the Court explained that it constituted "relief on the merits" because a consent decree is a " court-ordered 'chang[e] [in] the legal relationship between [the plaintiff] and the defendant.' " *Id.* (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792 (1989); citing *Hewitt*, 482 U.S. at 760-61; *Rhodes v. Stewart*, 488 U.S. 1, 3-4 (1988) (per curiam)) (alterations in *Buckhannon*). The "catalyst" party did not meet the test, however, because "[a] defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiffs sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Buckhannon*, 532 U.S. at 605.

While the circuits have had differing views on whether a party can prevail based on preliminary injunctive relief under *Buckhannon*, compare *John T. v. Del. County Intermediate Unit*, 318 F.3d 545, 559-60 (3d Cir. 2003); *Smyth v. Rivero*, 282 F.3d 268, 276-77 & n.9 (4th Cir.), *cert. denied*, 537 U.S. 825 (2002), *with Dubuc v. Green Oak Township*, 312 F.3d 736, 753-54 & n.8 (6th Cir. 2002); *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003), no circuit has engaged in robust analysis. Those that have said "no" have concluded that preliminary injunctive relief does not make the recipient a "prevailing party" because the relief is not based solely on the merits of the claims advanced in the lawsuit. *See John T.*, 318 F.3d at 559-60; *Smyth*, 282 F.3d at 276-77 & n.9. The Third Circuit, for example, explained that the preliminary injunction at issue was not "merits-based," but instead "was designed to maintain the status quo during the course of proceedings." *John T.*, 318 F.3d at 558-59 (internal quotation marks & citation omitted). Those in the opposing camp, by contrast, have emphasized the specific relief that the preliminary injunction in fact provided. The Ninth Circuit, for example, concluded that the preliminary injunction at issue

carried a sufficient " 'judicial imprimatur' " because "[i]n this case, the County was prohibited from introducing Watson's report at the termination hearing for one reason and for one reason only: because Judge Timlin said so." *Watson*, 300 F.3d at 1096; *cf. Dubuc*, 312 F.3d at 754 (rejecting fee award based on preliminary injunction because plaintiff's "goal in this suit [was] not to obtain a temporary certificate of occupancy, which the injunction provided, but to seek damages for alleged violations of [his] constitutional rights").

For our part, we held last term that the Court in *Buckhannon* did not simply reject the catalyst theory but established a framework—built on three "core principles"—"for construing and applying the 'prevailing party' requirement." *Thomas v. Nat'l Sci. Found.,* 330 F.3d 486, 492-93 (D.C. Cir. 2003). The first, and most central, principle is that a litigant must demonstrate "a court-ordered chang[e] [in] the legal relationship between [the plaintiff] and the defendant," *Buckhannon*, 532 U.S. at 604 (internal quotation marks & citations omitted), in order to qualify as a "prevailing party" under a fee-shifting statute. *See Thomas*, 330 F.3d at 492. The second is that "prevailing party" means " ' "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded." ' " *Id.* at 493 (quoting *Buckhannon*, 532 U.S. at 603 (in turn quoting BLACK'S LAW DICTIONARY 1145 (7th ed. 1999))) (alteration in *Buckhannon*). And the third is that a litigant does not prevail "by virtue of having 'acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by "*judicial* relief." ' " *Thomas*, 330 F.3d at 493 (quoting *Buckhannon*, 532 U.S. at 606 (in turn quoting & citing *Hewitt*, 482 U.S. at 760)) (emphasis in *Buckhannon*). In *Thomas* we concluded that, despite the plaintiffs having obtained a preliminary injunction and a partial grant of summary judgment, they failed to qualify as "prevailing parties" under the EAJA because "neither the preliminary injunction nor the partial summary judgment changed the legal relationship between

appellees and [the National Science Foundation (NSF)] in a way that afforded appellees the relief that they sought." *Thomas*, 330 F.3d at 493. The preliminary injunction, which prevented the NSF from "crediting, spending, obligating or using any of the money collected for, placed into, or taken from" a certain government fund, *id.* at 489 (internal quotation marks & citation omitted), "merely preserved the *status quo* pending final adjudication of the case" because it "did not change the legal relationship between the parties in a way that afforded appellees the relief they sought in their lawsuit." *Id.* at 493. Its "sole effect . . . was to prevent NSF from appropriating any money already collected from the registration assessment." *Id.* While I have no quarrel with the methodology, I believe the majority misapplies it here.

## II.

### A. *"Court-Ordered Change" in Parties' Legal Relationship*

Distinguishing *Thomas*, the majority concludes that "there was a court-ordered change in the legal relationship between Milk Producers and the Secretary" because the preliminary injunction "blocked enforcement" of the Secretary's regulation and, therefore, the Milk Producers never had to "operate under a market regime with a separate price for Class III butterfat." Maj. Slip Op. at 13. But the injunction here simply served the traditional "limited purpose" of a preliminary injunction, which is to "merely preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969); *see generally* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2947 (2d ed. 1992) ("[A] preliminary injunction is an injunction to protect plaintiff from irreparable injury and to preserve the court's power to render a

6

meaningful decision after a trial on the merits.") [hereinafter FEDERAL PRACTICE AND PROCEDURE]. Such a preliminary injunction preserves the trial court's power to adjudicate the underlying dispute by maintaining the *status quo ante*, *see Camenisch*, 451 U.S. at 395, or, simply, the *status quo*. *See, e.g., Consarc Corp. v. United States Treasury Dep't, Office of Foreign Assets Control*, 71 F.3d 909, 913 (D.C. Cir. 1995) (terms used interchangeably). And the "legal definition" of *status quo ante* has a "clear meaning" in our circuit. *See Consarc Corp.*, 71 F.3d at 913.

> *Black's Law Dictionary* defines *status quo* to mean "the existing state of things at any given date" and offers the example "[*s* ]*tatus quo ante bellum*" to mean "the state of things before the war." *Black's Law Dictionary* 1264 (5th ed. 1979). Judicial precedent confirms that "[t]he status quo is the last uncontested status which preceded the pending controversy." *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir. 1958); *see also Litton Systems, Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984).

*Id.* (alterations in *Consarc Corp.*); *accord Dist. 50, United Mine Workers of Am.*, 412 F.2d at 168. Had the district court intended to give the Milk Producers "concrete and irreversible" relief, Maj. Slip Op. at 13, rather than to preserve the *status quo*, it had the procedure readily at hand to decide the merits by consolidating the preliminary injunction hearing with the merits hearing. *See* FED. R. CIV. P. 65(a)(2); *Camenisch*, 451 U.S. at 395. It did not do so.

The majority appears to disregard the *temporary* nature of the injunctive relief by finding that it "saved" the Milk Producers a "substantial sum of money." Maj. Slip Op. at 14. It asserts that the Secretary's counsel conceded during oral argument that the

Milk Producers' savings were "permanent." *Id.* at 14. Whether or not the concession was made (a matter which, to me, is far from certain), the savings were permanent only when viewed from hindsight. The Milk Producers sought to enjoin implementation of the separate Class III Butterfat price because without an injunction, they asserted, they would suffer irreparable injury in the form of lost revenue from butterfat.[2] *See Memorandum of Points & Authorities in Support of Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction & for Expedited Hearing*, Jan. 19, 2001, at 2, *reprinted in* Joint Appendix (J.A.) at 29b. The preliminary injunction—which "enjoined the newly implemented amended regulations, made affirmative changes to the order language appearing [in the Federal Register], and *restored* the pricing system in place prior to the implementation of the amended regulations," *Select Milk Producers, Inc. v. Veneman*, 304 F. Supp.2d 45, 53 (D.D.C. 2004) (emphasis added)—prevented an immediate monetary loss. To view, as the majority does, an order that "restored" the *status quo* as awarding "permanent" relief, however, requires a "look back" for it became permanent only in light of events that unfolded two years later—*i.e.*, the Department's February 12, 2003 publication of the Final Rule omitting a separate Class III Butterfat price and the Milk Producers' dismissal of their suit in April 2003. The preliminary injunction thus kept the Milk Producers from losing

---

[2] Although the majority refers to the money involved as "savings," *see* Maj. Slip Op. at 13-14, in fact the Milk Producers, the sellers, would have received reduced payments from their buyers had the separate Class III Butterfat price gone into effect. *See Memorandum of Points & Authorities in Support of Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction & for Expedited Hearing*, Jan. 19, 2001, at 2, *reprinted in* J.A. at 29b. The Milk Producers did not "save" five million dollars as a result of the preliminary injunction; they did not lose five million dollars in revenue.

money by simply restoring the regulatory landscape that existed before the Secretary's Interim Final Order until their lawsuit became moot.

Nor does the subsequent mooting of the Milk Producers' lawsuit—not by adjudication but by voluntary regulatory change—bridge the gap between the preliminary relief granted and the award of "irreversible" relief. Relying on our decisions in *Nat'l Black Police Ass'n v. D.C. Bd. of Elections*, 168 F.3d 525 (D.C. Cir. 1999), and *Grano v. Barry*, 783 F.2d 1104 (D.C. Cir. 1986), the majority asserts that this case is "similar to situations in which we have found that the subsequent mootness of a case does not necessarily alter the plaintiffs' status as prevailing parties." Maj. Slip Op. at 14. But, as *Thomas* itself noted, the "specific relief" granted in *Nat'l Black Police Ass'n* and in *Grano* "was concrete and could not [have been] reversed despite a subsequent finding of mootness." 330 F.3d at 493. In *Nat'l Black Police Ass'n*, we held that the plaintiffs qualified as "prevailing parties" under 42 U.S.C. § 1988 because the district court, after holding a five-day trial, "issued an injunction on the grounds that the limitations [on campaign contributions] unconstitutionally infringed the free speech rights of candidates and the free association rights of contributors," which, the court said, constituted a "a real-world vindication of their First Amendment rights." 168 F.3d at 527-28. Similarly, in *Grano*, we held that the plaintiffs qualified as "prevailing parties" under 42 U.S.C. § 1988 because their "success before the District Court was clearly 'on the merits' " and was in "no way 'procedural' " in that the summary judgment they won had the "external effect of postponing the razing of the tavern until the election could be held." 783 F.2d at 1109-10. Even more recently, in *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962 (D.C. Cir. 2004), we held that the plaintiff, a non-profit educational organization, qualified as a prevailing party under the EAJA by obtaining a *permanent* injunction which "postpon[ed] conveyance of Fort Ritchie until the Secretary

complie[d] with the relevant regulations." *Id.* at 966. There we distinguished *Thomas* on the ground that the plaintiff in *Role Models Am.*, unlike the *Thomas* plaintiff, obtained the "precise relief it sought," *i.e.*, the "opportunity to compete for [the property]." *Id.* The difference between *Grano*, *Nat'l Black Police Ass'n* and *Role Models Am.*, on the one hand, and *Thomas* and this case, on the other, is easy to see: In *Grano*, *Nat'l Black Police Ass'n* and *Role Models Am.*, the plaintiffs received relief on the merits, here as in *Thomas*, the plaintiffs did not. Nor can it be said, as the majority does, that this case is like *Grano* in that the "Milk Producers' claim was *fully vindicated* by the court-ordered change in the parties' relationship." Maj. Slip Op. at 14-15 (emphasis added). The *Grano* plaintiffs' claim *was* fully vindicated because the district court, granting summary judgment in their favor, gave them precisely what they sought: a delay. *See* 783 F.2d at 1107, 1109. The Milk Producers, by contrast, did not sue the Secretary to *delay* the regulation but to invalidate it. Thus, while the *Grano* mootness resulted from the plaintiffs' full vindication on the merits—*i.e.*, the ultimate passage of the initiative[3]—here the mootness resulted from the Secretary's voluntary action—*i.e.*, a new regulation without the challenged Class III Butterfat price. In short, "the change in the parties' relationship" in *Grano* was court-ordered; here it was not.

The majority explicitly acknowledges the difference, *see* Maj. Slip Op. at 15, but reconciles this case with *Grano* and *Nat'l Black Police Ass'n* by declaring that "Milk Producers secured a preliminary injunction in this case largely because their likelihood of success on the merits was never seriously in doubt." Maj. Slip Op. at 15. But "likelihood of success on the merits" does not equal "success on the merits." *See Camenisch*,

---

[3] *See id.* at 1109 (mootness followed referendum and therefore "emphasize[d], rather than detract[ed] from, the practical substance of the[ plaintiffs'] victory").

451 U.S. at 394. If "likelihood of" success on the merits suffices here, why not in *Thomas*? While I agree that the Secretary does appear to have faced an uphill battle on the merits, the merits were never reached. And to rely only on the plaintiffs' likelihood of success on the merits, without regard to the other relevant factors—*i.e.*, irreparable harm, the interests of other parties and the public interest, *see, e.g., Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)—in order to determine whether the preliminary relief the Milk Producers obtained effected a "court-ordered 'chang[e] [in] the legal relationship between [the plaintiff] and the defendant,' " *Buckhannon*, 532 U.S. at 604 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792) (alterations in *Buckhannon*), seems a tricky proposition. How much of a "likelihood of success" is enough? Will a 75 per cent likelihood do? How about 50 per cent with a strong public interest showing to boot? The majority had to first collapse the standard four-factors test for granting preliminary injunctive relief into one factor—likelihood of success—and then equate likelihood of success with success in order to declare the Milk Producers "prevailing parties." But *Buckhannon* and, later, *Thomas*, never contemplated such complicated footwork to follow what was intended to be a clear-cut path.

In a case similar to this one the Fourth Circuit held that a preliminary injunction did not effect a court-ordered change in the parties' legal relationship. *Smyth v. Rivero*, 282 F.3d 268, 276-77 (4th Cir. 2002). In *Smyth*, the plaintiffs contended that they were "prevailing parties" under 42 U.S.C. § 1988 because they obtained a preliminary injunction preventing the Virginia Department of Social Services from denying them welfare benefits under a new paternity identification policy. *Id.* at 275. The Fourth Circuit disagreed, explaining that a preliminary injunction "is closely analogous . . . to the examples of judicial relief deemed insufficient in *Buckhannon*." *Id.* at 276. As to the plaintiffs' likelihood of success on the merits, the court explained that "[a] district court's determination that such a

showing has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome" because "the merits inquiry in the preliminary injunction context is necessarily abbreviated." *Id.* The court observed, moreover, that the district court must be guided not only by the plaintiff's likelihood of success "but also by other considerations, notably a balancing of likely harms." *Id.* While the balance of interests is "well suited to reconciling the practical, equitable, and legal concerns that face a court determining whether to grant a party interim relief, it renders such relief an unhelpful guide to the legal determination of whether a party has prevailed." *Id.* at 277 (internal citation omitted). Accordingly, the court held that that "interplay" as well as the "less stringent assessment of the merits of claims that are part of the preliminary injunction context belie the assertion that the district court's decision to grant a preliminary injunction was an 'enforceable judgment[ ] on the merits' or something akin to one for prevailing party purposes." *Id.* (quoting & citing *Buckhannon*, 532 U.S. at 604) (alteration in *Smyth*).

### B. *"Party in Whose Favor . . . Judgment is Rendered"*

Turning to the second *Buckhannon* principle, the majority also finds this one satisfied, concluding, "[t]he 2001 preliminary injunction meets the legal definition of a judgment, and there is no dispute that it was rendered in Milk Producers' favor." Maj. Slip Op. at 17. While the majority states that "the term 'judgment' includes 'a decree and any order from which an appeal lies,' " Maj. Slip Op. at 16 (quoting BLACK'S LAW DICTIONARY 846 (7th ed. 1999)), the very first entry under "judgment" in the same edition of the BLACK'S LAW DICTIONARY used by the *Buckhannon* Court (as well as by my colleagues) defines it as "[a] court's *final* determination of the rights and obligations of the parties in a case." BLACK'S LAW DICTIONARY 846 (7th ed. 1999) (emphasis added). But there is no need for dictionary one-upmanship to question the majority's

reformulation of *Buckhannon*'s second "core" principle. If "any order from which an appeal lies" qualifies the recipient as "one who has been awarded some relief by the court," *Buckhannon*, 532 U.S. at 603, and therefore a "prevailing party," will a favorable procedural ruling—say, a class certification under FEDERAL RULES OF CIVIL PROCEDURE RULE 23—suffice? This is, after all, an "order from which an appeal lies." *See* FED. R. CIV. P. 23(f) ("A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order."). In *Hanrahan v. Hampton*, 446 U.S. 754 (1980), the Supreme Court indicated that such an order will not do. In holding that the plaintiffs were not "prevailing parties" based on the Seventh Circuit's "interlocutory dispositions, which affected only the extent of discovery," the Court explained that, "[a]s is true of other procedural or evidentiary rulings, these determinations may affect the disposition on the merits, but were themselves not matters on which a party could 'prevail' for purposes of shifting his counsel fees to the opposing party under § 1988." *Id.* at 759 (citing *Bly v. McLeod*, 605 F.2d 134, 137 (4th Cir. 1979)).

Moreover, the *Buckhannon* Court itself gave the term "judgment" a more precise (and limited) meaning. *See* 532 U.S. at 603-04. It stated unequivocally that, before the plaintiff can be said to "prevail," " '[r]espect for ordinary language requires that [he] receive at least some relief on the merits of his claim.' " *Id.* at 604 (quoting *Hewitt*, 482 U.S. at 760) (alteration in *Buckhannon*). "[T]aken together," the Court explained, its precedent "establish[es] that enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." 532 U.S. at 604 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792-93). According to *Buckhannon*, then, a favorable judgment is one that affords a party some relief *on the merits*. *See* 532 U.S. at 603-04; *but see*

*Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002) ("Judgments and consent decrees are examples of [a judicial imprimatur], but they are not the only examples."), *cert. denied*, 538 U.S. 923 (2003). Furthermore, our own *Thomas* decision presents no conflict with this interpretation. *See* 330 F.3d at 493 (" '[A] "prevailing party" is one who has been awarded some relief by the court.' " (quoting *Buckhannon*, 532 U.S. at 603)). The Milk Producers did not receive the merits relief they sought—invalidation of the Class III Butterfat price regulation—by *judgment* but, instead, by the Secretary's voluntary action.

## C. *"Judicial Relief" Requirement*

The majority explains that the Milk Producers received "judicial relief" because they "asked the District Court for equitable relief in the form of a preliminary injunction that would enjoin the implementation of the December 2000 rule before the separate price for Class III butterfat took retroactive effect."[4] Maj. Slip Op. at 17. Accordingly, in the majority's view, "[w]hen the District Court issued the injunction, it granted Milk Producers the precise relief that they had requested." *Id.* Not so. The sole effect of the preliminary injunction was to preserve the *status quo*, not give the Milk Producers their desired relief: to wit, a new and procedurally correct rulemaking on the Class III Butterfat price. *See Milk Producers' Complaint*

---

[4] The third *Buckhannon* factor is less a "core" principle than a caveat. *See Buckhannon*, 532 U.S. at 606 (noting no attorney's fees if plaintiff "acquired a judicial pronouncement that the defendant has violated the constitution unaccompanied by '*judicial* relief' " (quoting & citing *Hewitt*, 482 U.S. at 760)) (emphasis in *Buckhannon*); *see also Thomas*, 330 F.3d at 493 ("[A] claimant is not a 'prevailing party' merely by virtue of having 'acquired a judicial pronouncement that the defendant has violated the constitution unaccompanied by "*judicial* relief." ' " (quoting *Buckhannon*, 532 U.S. at 606 (in turn quoting *Hewitt*, 482 U.S. at 760))).

*for Declaratory & Injunctive Relief*, Jan. 11, 2001, at 18-19, *reprinted in* J.A. at 24-25. Ultimately, *the Secretary*, by voluntary action, gave them the "precise relief" they sought. The majority's attempt to link the preliminary relief and the final relief sounds suspiciously like the "catalyst theory" jettisoned by the *Buckhannon* Court. *See Buckhannon*, 532 U.S. at 605 ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change."). That is, while the preliminary injunction no doubt helped prompt the Secretary to abandon the separate Class III Butterfat price, "judicial prompting," *Buckhannon* made plain, is not enough.

The district court used similar reasoning, explaining that, given the retroactive nature of the Secretary's price announcement, the Milk Producers' interim victory "was the only effective relief they could seek" and that "no subsequent final judgment on the merits or consent decree could award plaintiffs effective relief." *Select Milk Producers*, 304 F. Supp.2d at 53. But the fact that absent the preliminary injunction the regulation would have imposed a retroactive Class III Butterfat price does not alter its preliminary nature. The district court could not have been clearer on this point.

> ORDERED that *until the final determination of this action*, the Secretary, his officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise are ENJOINED from implementing the provisions of a new Class III Butterfat Price in amended regulations found at 7 C.F.R. Parts 1000-1135 and at [65] Fed. Reg. 76832 (December 7, 2000) and 65 Fed. Reg. 82832 (December 28, 2000). In

> compliance with this Order, the Secretary is directed to make necessary changes to the Interim Final Order as specified in Attachment 1 hereto.

*Select Milk Producers, Inc. v. Glickman,* No. 01 CV 00060, at 2 (D.D.C. Jan. 31, 2001) (order granting preliminary injunction) (emphasis added), *reprinted in* J.A. at 31. Preventing the regulations from taking effect on February 2nd was thus a necessary step toward obtaining the temporary relief the Milk Producers sought—the "loss of an estimated $5,000,000," *Select Milk Producers*, 304 F. Supp.2d at 53—but it was not the *final* relief they sought, *i.e.*, to prevent regulations, which the Milk Producers alleged were procedurally defective, from *ever* taking effect. This required either a judgment on the merits or entry of a court-ordered consent decree. Just as we concluded in *Thomas* that the plaintiffs "filed a lawsuit in order to obtain a refund from NSF, but the preliminary injunction did nothing to vindicate that claim," 330 F.3d at 493, the Milk Producers filed their lawsuit in order to invalidate the rule containing the separate Class III Butterfat price but the preliminary injunction did not "vindicate that claim." *See id.*

The majority emphasizes that "this is not a case in which the Government voluntarily changed its ways *before* judicial action was taken." Maj. Slip Op. at 17 (emphasis in original). According to the majority, "[i]f the Government had acted to moot this case through voluntary cessation before there was judicially sanctioned change in the legal relationship of the parties, Milk Producers would not have been 'prevailing parties' " because "as the Court noted in *Buckhannon*, a defendant's 'voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change.' " *Id.* at 17 (quoting *Buckhannon*, 532 U.S. at 605). This conclusion follows, of course, only if one accepts that the

preliminary injunction effected a "judicially sanctioned change in the legal relationship of the parties" à la *Buckhannon*. I do not and neither did *Buckhannon*:

> [A "prevailing" party is n]ot the party that ultimately gets his way because his adversary dies before the suit comes to judgment; not the party that gets his way because circumstances so change that a victory on the legal point for the other side turns out to be a practical victory for him; *and not the party that gets his way because the other side ceases (for whatever reason) its offensive conduct.*

532 U.S. at 615 (Scalia, J., concurring) (emphasis added).

And as the majority attempts to explain away one mootness problem, it creates another. *See* Maj. Slip Op. at 18-19. It acknowledges "the well-recognized principle that, normally, when a losing party is blocked from appealing an adverse judgment or order because the case becomes moot due to happenstance, the court will vacate the disputed judgment or order." *Id.* at 18 (citing *U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18 (1994)). In *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), for example, the Supreme Court stated that "[t]he established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *Id.* at 39. By following this procedure, the Court explained, "the rights of all parties are preserved; none is prejudiced by a decision which . . . was only preliminary." *Id.* at 40. The majority correctly explains that " 'vacatur is usually inappropriate when "the party seeking relief from the judgment below caused the mootness by voluntary action." ' " Maj. Slip Op. at 18 (quoting *Nat'l Black Police Ass'n v. Dist. of Columbia*,

108 F.3d 346, 351 (D.C. Cir. 1997) (in turn quoting *Bancorp*, 513 U.S. at 24); citing *N. Cal. Power Agency v. NRC*, 393 F.3d 223, 225 (D.C. Cir. 2004))). It then concludes that it is "not somehow unfair" to treat the Milk Producers as "prevailing parties," despite the mootness of their lawsuit, because the Secretary failed to appeal and instead "voluntarily elected to moot the case." Maj. Slip Op. at 18-19. This might sound right but for the majority's conclusion that the Milk Producers "prevailed" only because of the district court's "likelihood of success" finding and because the mooting of the case—effected by the losing party's action—turned "likelihood of success" into "success." *See* Maj. Slip Op. at 13-15. It is one thing to say that vacatur of an adverse judgment is inappropriate if subsequent mootness is caused by the losing party's voluntary action but quite another to prejudice the losing party based on its voluntary action that creates the mootness. The majority offers no case to support the latter and I cannot agree that the result it produces is "not somehow unfair." Maj. Slip Op. at 18.

My disagreement with the majority's disposition does not necessarily mean that I believe a preliminary injunction may *never* constitute the sort of judicial *imprimatur* meriting an award of costs and fees under the EAJA. *See, e.g.*, FED. R. CIV. P. 65(a)(2) (allowing preliminary–cum–permanent relief after consolidated hearing). All we need decide today is that the preliminary injunction here, by doing nothing more than preserving the *status quo*, did not make the Milk Producers prevailing parties. Because the Secretary had disturbed the *status quo* by promulgating a separate Class III Butterfat price, it was necessary for the district court to order the Secretary to restore it. This fits with the traditional office of a preliminary injunction inasmuch as " '[s]tatus quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.' " *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013

(10th Cir. 2004) (McConnell, J., concurring) (quoting 11A
FEDERAL PRACTICE AND PROCEDURE § 2948). Accordingly,
while the preliminary injunction in *Thomas* restrained the
government from taking action in order to preserve an existing
fund and the district court here ordered the Secretary to take
action in order to prevent the Milk Producers from losing funds,
both preliminary injunctions operated—in different but
nonetheless straightforward ways—to maintain the *status quo*.

Our decision in *Thomas*, 330 F.3d at 493, manifests a
disinclination to join those circuits that have announced a *per
se* rule rejecting preliminary injunctive relief as support for a
"prevailing party" finding.[5] If the majority means to hold that
the five million dollars that the Milk Producers did not lose
when the district court entered the preliminary injunction
comprises the "concrete and irreversible" relief which turned
the preliminary injunction into relief on the merits, then I
believe our circuit is endorsing a *per se* rule the other way. The
"retained" five million dollars resulted from the preliminary

---

[5] *See John T. v. Del. County Intermediate Unit*, 318 F.3d 545, 558
(3d Cir. 2003) ("The Preliminary Injunction is an insufficient basis on
which to award attorney's fees . . . because it is interim relief not
based on the merits . . . ."); *Smyth v. Rivero*, 282 F.3d 268, 277 (4th
Cir.) ("[W]e hold that the preliminary injunction entered by the district
court does not satisfy the prevailing party standard . . . ."), *cert.
denied*, 537 U.S. 825 (2002); *but see Dubuc v. Green Oak Township*,
312 F.3d 736, 753 (6th Cir. 2002) ("With respect to a preliminary
injunction, there is only prevailing party status if the injunction
represents 'an unambiguous indication of probable success on the
merits, and not merely a maintenance of the status quo ordered
because the balance of equities greatly favors the plaintiff.' " (quoting
*Webster v. Sowders,* 846 F.2d 1032, 1036 (6th Cir.1988))); *Watson v.
County of Riverside*, 300 F.3d 1092, 1096 (9th Cir. 2002) ("A
preliminary injunction issued by a judge carries all the 'judicial
imprimatur' necessary to satisfy *Buckhannon.*"), *cert. denied*, 538 U.S.
923 (2003).

enjoining of the regulation in the same way that preliminarily enjoining, say, a change in licensing requirements would result in the licensee not having to comply with them *pendente lite.* If the preliminary injunction eventually becomes a permanent one, the preliminary relief does too. But that is because the eventual court order is a permanent (or final) one. The preliminary relief does not transmogrify into permanent relief without it. Much less should it do so when, as *Buckhannon* spells out, 532 U.S. at 605, the controversy ends by *other* than court order.[6]

### III.

The words "preliminary" and "prevailing" are not ones that easily fit together. To make them do so in this case, the majority has put together the EAJA, *Buckhannon* and *Thomas* and produced a Rube Goldbergesque result. I fear it has assumed the role Justice White warned against some time ago. Through fee-shifting statutes like the EAJA the Congress did not "extend[] any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260 (1975). For the foregoing reasons, I respectfully dissent.

---

[6] In responding to the dissent, the majority seems to have minimized the significance of its limiting "concrete and irreversible" relief rationale that depends on the "retained" five million dollars, emphasizing instead that the "2001 preliminary injunction provided concrete and irreversible judicial relief . . . based on the . . . conclusion that Milk Producers were likely to prevail on the merits." Maj. Slip Op. at 16. If my reading of its response is correct, the majority has in fact embraced a *per se* rule for *no* preliminary injunction can be granted without a showing of likelihood of success on the merits.